No. 73,202

WALLACE M. WEBER, M.D., d/b/a HEARTLAND DERMATOLOGY
CENTER, *Appellee,* v. DONALD K. TILLMAN, JR., D.O.,
*Appellant.*

(913 P.2d 84)

 Opinion filed March 8, 1996. 

*John T. Bird*, of Glassman, Bird & Braun, of Hays, argued the cause, and *Scott J. Miller*, of the same firm, and *Thomas M. Wasinger*, of Hays, were with him on the brief for appellant.

*Lee Turner*, of Lee Turner, P.A., of Great Bend, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Plaintiff employer and defendant employee, both dermatologists, entered into an employment contract which included a covenant not to compete should the employment cease for any reason. Employee appeals the trial court's enforcement of the noncompetition covenant, claiming that the noncompetition covenant is unenforceable as violative of public policy and that the trial court erred in calculating the liquidated damages of the noncompetition covenant. The appeal was transferred to this court pursuant to K.S.A. 20-3017.

Dr. Wallace M. Weber, a physician board certified in the field of dermatology doing business as Heartland Dermatology Center, has practiced in Hays, Great Bend, and Smith Center, Kansas since 1977. Prior to 1992, Dr. Weber was the only dermatologist practicing in northwest or north central Kansas. The next closest dermatologists were located in Salina and Hutchinson.

In 1991 Dr. Weber recruited Dr. Donald K. Tillman to join his practice. Dr. Tillman, a doctor of osteopathic medicine who is now board certified in the field of dermatology, was completing his preceptorship (similar to a residency) in Florida. They entered into an employment contract on September 9, 1991, and Dr. Tillman began practicing with Dr. Weber in July 1992. The contract was prepared for Dr. Weber by a Pennsylvania company. Neither party participated in drafting the contract.

The employment contract provided that the employment was "at will" and could be terminated by either Dr. Tillman or Dr. Weber upon 60 days' written notice. The contract also included a noncompetition covenant. Although the employment contract is not included in the record on appeal, the noncompetition clause was detailed by the trial court in its journal entry:

"c. **Paragraph No. 10. Restrictive Covenant:** While you are an employee, and for a period of two (2) years after your employment ends (for any reason), you will not render any medical services on behalf of yourself or any business or entity engaged in providing professional dermatology services within a thirty (30) mile radius of any office or place of business of the practice at the time your employment ends. This promise includes your not practicing at any hospital within the area described.

·"You agree that this restriction applies if your employment ends at any time and for any reason, until and unless a succeeding written agreement no longer contains this restriction. Alternatively, you may elect to practice medicine in the aforementioned area upon payment of an amount equal to six months salary and bonus."

Dr. Weber's practice is (and was when Dr. Tillman's employment terminated) in Hays, Great Bend, and Smith Center, so the 30-mile radius referred to in the noncompetition covenant is 30 miles surrounding those cities. The covenant requires Dr. Tillman to refrain from practicing within that territory or, alternatively, he may practice in those areas upon payment to Dr. Weber of an amount equal to 6 months' salary and bonus.

In his first year with Dr. Weber, Dr. Tillman earned $120,000 annually plus a bonus calculated every 6 months. The bonus was based on Dr. Tillman's productivity and was determined according to a specified formula. For the first 6 months, Dr. Weber's accountant calculated Dr. Tillman's bonus to be $2,242.29. When Dr. Tillman disputed the calculation, Dr. Weber paid Dr. Tillman an additional $10,000, which the parties treated as a gift but which was shown as income for tax purposes. Dr. Tillman's bonus the second 6-month period was approximately $20,000. His second year of employment, Dr. Tillman's annual salary increased to $144,000 plus the bonus. For the third 6-month period Dr. Tillman received a bonus of $14,000.

On January 2, 1994, Dr. Tillman informed Dr. Weber that he was terminating his employment. Dr. Tillman continued to work for Heartland Dermatology until March 18, 1994, by agreement with Dr. Weber. Dr. Tillman was aware that the restrictive covenant would be effective when he left the employment of Heartland Dermatology Center. Nevertheless, upon leaving Dr. Weber's employment, Dr. Tillman immediately commenced to practice dermatology in Hays in violation of the restrictive covenant. Dr. Tillman did not pay liquidated damages under the alternative provision of the restrictive covenant.

Dr. Weber initiated this action to enjoin Dr. Tillman from practicing dermatology in the restricted areas or, alternatively, to require him to pay liquidated damages under the contract. Although there was testimony concerning Dr. Tillman's reasons for leaving the practice, the trial court found that the reasons were irrelevant because the employment could be terminated by either party for any reason.

At trial, Dr. Weber's accountant, using what the trial court found to be generally accepted accounting principles, determined the amount of 6 months' salary and bonus to be $82,226.32. The accountant testified that this amount was calculated by adding Dr. Tillman's bonuses, including the $10,000 paid when Dr. Tillman disputed the first 6-month bonus, over the 1 ½ years of employment to determine the 6-month average of the bonuses plus Dr. Tillman's salary for the last 6 months of his employment ($144,000 annually).

Dr. Tillman's position at trial and on appeal is that the restrictive covenant is unenforceable as against public policy. He argues that the covenant is unenforceable and against public policy because (1) it is difficult to recruit new doctors to rural areas, (2) the dermatology needs of patients in northwest Kansas would be underserved if only Dr. Weber were practicing in those areas, and (3) Dr. Weber would hold a monopoly if he were the only practicing dermatologist in those areas. Dr. Tillman presented the testimony of Beth Bowerman, the Director of Medical Recruitment of Hays Medical Center, concerning the difficulty of recruiting new doctors to rural areas. She testified that using the most conservative model

of evaluation, northwest Kansas needs three dermatologists and that the ability to serve those needs would be in jeopardy if Dr. Tillman were enjoined from practicing in Hays.

The trial court found that Bowerman's testimony concerning the difficulty in recruiting new doctors to rural areas had no probative value in determining the effect of the restrictive covenant in the Dr. Weber-Dr. Tillman contract. The trial court concluded that the covenant not to compete was reasonable and enforceable and not against public policy. The court noted that the restrictive covenant is silent as to which 6-month period should be used to calculate the liquidated damages and as to the method of payment but found that a reasonable construction of the contract was a lump sum payment equal to the last 6 months of employment, plus all bonuses paid. The court granted a permanent injunction for a period of 2 years or, alternatively, ordered that Dr. Tillman pay Dr. Weber the sum of $82,226.32 within 10 days. Dr. Tillman timely appealed, and the appeal was transferred to this court on Dr. Tillman's motion.

## PUBLIC POLICY

The primary dispute in this appeal is whether the restrictive covenant is contrary to public policy and therefore unenforceable. The parties disagree as to this court's standard of review. Dr. Tillman asserts that the question of enforceability is a matter of law over which this court's review is unlimited. Dr. Weber, conversely, asserts that the trial court made a finding of fact that the restrictive covenant does not contravene public policy. As authority for his position, he cites *Eastern Distributing Co., Inc. v. Flynn*, 222 Kan. 666, 673, 567 P.2d 1371 (1977), where this court stated: "While the ultimate determination whether a legitimate interest subject to protection is shown may be a matter of law, the underlying facts are to be determined by the trial court after hearing the testimony presented."

Dr. Weber stresses that this court's review of findings of fact made by a trial court is limited to whether the findings are supported by substantial competent evidence, drawing all inferences in favor of

the trial court's findings, and that this court cannot set aside findings of fact unless clearly erroneous.

Although Dr. Weber is correct in his statements of our scope of review of findings of fact, the ultimate question whether a restrictive covenant is contrary to public policy is a question of law, and an appellate court's review of that question is unlimited.

A noncompetition covenant ancillary to an employment contract is valid and enforceable if the restraint is reasonable under the circumstances and not adverse to the public welfare. *Eastern Distributing*, 222 Kan. at 670; see *Puritan-Bennett Corp. v. Richter*, 235 Kan. 251, 254, 679 P.2d 206 (1984); *H & R Block, Inc. v. Lovelace*, 208 Kan. 538, 543-44, 493 P.2d 205 (1972); *EVCO Distributing, Inc. v. Brandau*, 6 Kan. App. 2d 53, 58, 626 P.2d 1192, *rev. denied* 230 Kan. 817 (1981). The rationale for enforcing a noncompetition covenant is based on the freedom of contract. See *Francis v. Schlotfeldt*, 10 Kan. App. 2d 517, 518, 704 P.2d 381 (1985). However, it is well settled that only a legitimate business interest may be protected by a noncompetition covenant. If the sole purpose is to avoid ordinary competition, it is unreasonable and unenforceable. *Eastern Distributing*, 222 Kan. at 671; see *EVCO Distributing*, 6 Kan. App. 2d 53, Syl. ¶ 5. Additionally, noncompetition covenants included in employment contracts are strictly construed against the employer. *Eastern Distributing*, 222 Kan. at 671; *Safelite Glass Corp v. Fuller*, 15 Kan. App. 2d 351, 356-57, 807 P.2d 677, *rev. denied* 249 Kan. 776 (1991).

Cases evaluating noncompetition agreements between physicians have been published by Kansas appellate courts only once. In *Foltz v. Struxness*, 168 Kan. 714, 215 P.2d 133 (1950), Dr. Foltz, a physician and surgeon with a well-established practice in Hutchinson, Kansas, recruited Dr. Struxness, a young doctor with less than 1 year's experience following his training, to join his practice. The employment agreement entered into by the parties specified that upon termination of the agreement and the failure of the parties to agree to a partnership agreement, Struxness would not practice medicine or surgery within a radius of 100 miles from Hutchinson for a period of 10 years from the date of the agreement. The parties ultimately failed to reach a partnership agreement, though

each acted in good faith. Two years after entering into the employment agreement, Struxness left Foltz' practice and started his own. A substantial number of Foltz' patients followed Struxness, and Foltz' practice suffered accordingly. The trial court enforced the noncompetition agreement but reduced the territory restriction to a 5-mile radius from Hutchinson. 168 Kan. at 718-19.

In evaluating the reasonableness of the agreement, the *Foltz* court noted that the purpose and intent was to protect encroachment on the professional business Foltz had devoted most of his life to building. 168 Kan. at 721. Concerning the public policy, it stated:

"The instant contract is not violative of any positive statute or well-established rule of law. It is the duty of the courts to sustain the legality of contracts in whole or in part when fairly entered into, if reasonably possible to do so, rather than to seek loopholes and technical legal grounds for defeating their intended purpose. It has also been said, and we think rightly, the paramount public policy is that freedom to contract is not to be interfered with lightly. [Citation omitted.]" 168 Kan. at 721-22.

The *Foltz* court noted the trial court had found that Hutchinson had lost no doctors by death or retirement since the end of World War II and, further, 10 new doctors had begun practicing medicine and surgery in Hutchinson; thus, the city of Hutchinson was no more in need of doctors and surgeons than many other communities in Kansas. It found there was no attempt at a monopoly by Foltz because any other physician and surgeon was free to practice within the territory involved. The *Foltz* court found no reasonable basis to disturb the trial court's finding that no public policy or public interest was affected by the restraint on Struxness' practice of medicine and surgery. 168 Kan. at 722.

In *H & R Block*, 208 Kan. at 544, this court set out factors which are considered in evaluating the reasonableness of noncompetition covenants contained in employment contracts, stating:

"Although there is no rigid, absolute norm by which the reasonableness of a covenant against competition may be determined, rules evolving generally . . . are to the effect that the rights of the promisee, the promisor and the general public are to be taken into account; area and time limitations must be reasonable under the facts and circumstances of the particular case [citations omitted]."

Other jurisdictions have recognized similar factors in evaluating noncompetition covenants entered into between physicians. *Phoenix Orthopaedic Surgeons v. Peairs*, 164 Ariz. 54, 59, 790 P.2d 752 (Ct. App. 1989); *Duffner v. Alberty*, 19 Ark. App. 137, 139, 718 S.W.2d 111 (1986); *Dick v. Geist*, 107 Idaho 931, 933, 693 P.2d 1133 (Ct. App. 1985); *Retina Services, Ltd. v. Garoon*, 182 Ill. App. 3d 851, 855, 538 N.E.2d 651 (1989); *Budoff, P.C. v. Jenkins*, 143 App. Div. 2d 250, 252, 532 N.Y.S.2d 149 (1988); *Iredell Digestive Disease Clinic v. Petrozza*, 92 N.C. App. 21, 26, 373 S.E.2d 449 (1988); *Gant v. Hygeia Facilities Foundation*, 181 W. Va. 805, 807, 384 S.E.2d 842 (1989); *Pollack v. Calimag*, 157 Wis. 2d 222, 236-37, 458 N.W.2d 591 (Ct. App. 1990). See Berg, *Judicial Enforcement of Covenants Not to Compete Between Physicians: Protecting Doctors' Interests at Patients' Expense*, 45 Rutgers L. Rev. 1 (1992) for a recent review of noncompetition agreements between physicians. The analysis of whether the noncompetition clause is reasonable evaluates these factors: (1) Does the covenant protect a legitimate business interest of the employer? (2) Does the covenant create an undue burden on the employee? (3) Is the covenant injurious to the public welfare? (4) Are the time and territorial limitations contained in the covenant reasonable? The determination of reasonableness is made on the particular facts and circumstances of each case.

The trial court concluded that the noncompetition covenant was reasonable, enforceable, and not against public policy, but the court did not specifically evaluate the factors in its journal entry. Where the trial court made factual determinations, we must follow those determinations if supported by competent evidence. Where the trial court failed to make factual findings, we must presume that the trial court found all facts necessary to support its judgment because there was no objection that the findings of fact and conclusions of law were inadequate. See *Galindo v. City of Coffeyville*, 256 Kan. 455, 467, 885 P.2d 1246 (1994). We will review the record and address each factor, though not in the order stated.

## Time and Territory Limitations

The noncompetition covenant precludes Dr. Tillman from prac-

ticing dermatology for 2 years within a 30-mile radius of any office or place of business of the Heartland Dermatology Center at the time Dr. Tillman's employment ends. Dr. Tillman makes no argument on appeal, nor did he to the trial court, that these time and territory limitations are unreasonable.

The territory restriction is limited to the territory surrounding any clinic in existence at the time Dr. Tillman's employment ended; the territory is not enlarged should Dr. Weber open a new location following the termination of Dr. Tillman's employment. *Cf. Osta v. Moran*, 208 Ga. App. 544, 547, 430 S.E.2d 837 (1993) (territory extended to a 50-mile radius of any office operated by the employer medical clinic and was not limited to offices in operation at the end of the employment; no matter where the physician set up practice during the period restricted, the clinic could move to within 50 miles of the physician). In *Foltz*, 168 Kan. 722, this court upheld a noncompetition covenant which restricted a physician's practice for 10 years, though the original 100-mile territory was reduced to a 5-mile territory. There is no factual basis for finding that the time and territory restrictions of Dr. Tillman's employment contract are unreasonable here.

## Undue Burden on Employee

Dr. Tillman also does not argue that the noncompetition covenant creates an undue burden on him. Dr. Tillman is not restricted from pursuing his chosen profession altogether. He may practice dermatology anywhere and any time except within a limited territory and time. Moreover, the limiting covenant references "providing professional dermatology services," which allows Dr. Tillman to practice other areas of medicine within the restricted territory. There is no undue burden on Dr. Tillman's right to practice medicine.

For cases discussing undue burden on an employee's clause of employment contract, see *Phoenix Orthopaedic Surgeons*, 164 Ariz. at 60 (physician not restricted from right to work in chosen occupation); *Retina Services*, 182 Ill. App. 3d at 857 (stating that Illinois Supreme Court has reasoned that there is no special hardship where the employee could practice elsewhere or resume prac-

ticing in the restricted area after the restricted period ended); *Field Surgical Assoc., Ltd. v. Shadab,* 59 Ill. App. 3d 991, 996, 376 N.E.2d 660 (1978) (no special hardship since physician can resume practice in 5-mile restricted area after 5 years and can practice anywhere else in the meantime); *Lareau v. O'Nan,* 355 S.W.2d 679 (Ky. 1962) (physician could practice anywhere in nation but Henderson County, Kentucky); *Budoff,* 143 App. Div. 2d at 252 (no argument that covenant is unduly burdensome); *Pollack,* 157 Wis. 2d at 238-39 (agreement does not affect right to practice general medicine wherever and whenever physician chooses and does not affect right to continue specialty of treating chronic pain outside the restricted territory); *Fields Foundation, Ltd. v. Christensen,* 103 Wis. 2d 465, 480, 309 N.E.2d 125 (Ct. App. 1981) (covenant does not affect physician's right to practice obstetrics and gynecology anywhere and anytime; court modified covenant to permit physician to perform second-trimester abortions where employer's business was limited to first-trimester abortions); but see *Damsey v. Mankowitz,* 339 So. 2d 282, 283 (Fla. Dist. App. 1976) (unduly harsh and oppressive because the employee would have to leave the community).

## Legitimate Business Interest of Employer

The next factor evaluates whether Dr. Weber has a legitimate business interest in the enforcement of the noncompetition covenant. The trial court did not specifically address this factor in its journal entry but did find the covenant reasonable; therefore, we presume the court found Dr. Weber did have a legitimate business interest to protect. The reasonableness of the time and territory restrictions is also part of the factor evaluating the legitimate business interests of the employer. The restrictions must be no greater than necessary to protect the employer's interests. See *Phoenix Orthopaedic Surgeons,* 164 Ariz. at 60; *Duffner,* 19 Ark. App. at 139; *Retina Services,* 182 Ill. App. 3d at 855; *Ellis v. McDaniel,* 95 Nev. 455, 458, 596 P.2d 222 (1979); *Gant,* 181 W. Va. at 807; *Fields Foundation,* 103 Wis. 2d at 479.

In reviewing a noncompetition covenant between a wholesale liquor distributor and one of its route salesmen, this court recog-

nized that "customer contacts" is a legitimate interest an employer may protect. *Eastern Distributing*, 222 Kan. at 671. Other jurisdictions have recognized, in addition to customer contacts, that an employer has a legitimate business interest to protect in the special training of employees, trade secrets, confidential business information, loss of clients, good will, reputation, seeing that contracts with clients continue, and referral sources. See *Odess v. Taylor*, 282 Ala. 389, 394, 211 So. 2d 805 (1968); *Duffner*, 19 Ark. App. at 139-40; *Frazier & Dallas v. Dettman*, 212 Ill. App. 3d 139, 146, 569 N.E.2d 1382 (1991); *Ellis*, 95 Nev. at 458; *Budoff*, 143 App. Div. 2d at 252; *Ippolito v. NEEMA Emergency Med. of N.Y.*, 127 App. Div. 2d 821, 822, 512 N.Y.S.2d 216 (1987); *Gant*, 181 W. Va. at 807-08; *Pollack*, 157 Wis. 2d at 237; *Fields Foundation*, 103 Wis. 2d at 471.

In *Retina Services*, 182 Ill. App. 3d at 855, the court first recognized that a professional's medical practice is a protected business interest, then stated a two-part test for evaluating the employer's legitimate interests: The employer must have a near-permanent relationship with customers, and the employee would not have come into contact with the customers were it not for his or her employment. 182 Ill. App. 3d at 856. Other courts have recognized that an employer's relationship with customers is its most valuable asset. See *Pollack*, 157 Wis. 2d at 237.

Although it is agreed that preventing ordinary competition of the kind a stranger could give is not a legitimate business interest supporting a noncompetition covenant, see *Eastern Distributing*, 222 Kan. 666, Syl. ¶ 2; *Osta v. Moran*, 208 Ga. App. at 547; *Hoddeson v. Conroe Ear, Etc., Assoc.*, 751 S.W.2d 289, 290 (Tex. App. 1988), courts have pointed out that a protected interest exists where the employee obtains an unfair competitive advantage. See *Duffner*, 19 Ark. App. at 139-40; *Metropolitan Med. Group v. Eaton*, 154 App. Div. 2d 252, 254, 546 N.Y.S.2d 90 (1989). In *Fields Foundation*, 103 Wis. 2d at 474, the court pointed out that the physician-employee's identification with the employer's goodwill made him a more formidable competitor, so the competition was unfair.

In evaluating noncompetition covenants, some courts have evaluated whether the employee solicited and took away former patients from the employer. See *Duffner*, 19 Ark. App. at 139-40; *Budoff*, 143 App. Div. 2d at 251; *Gant*, 181 W. Va. at 807-08. Other courts have pointed out other relevant facts such as that the employee brought no patients to the association with the employer, had no connection to the community prior to or became known to the community through the employment, or had little practical experience before becoming associated with the employer. See *Canfield v. Spear*, 44 Ill. 2d 49, 51, 254 N.E.2d 433 (1969); *Retina Services*, 182 Ill. App. 3d at 858; *Fields Foundation*, 103 Wis. 2d at 472-73. Additionally, the *Fields Foundation* court mentioned the employer's struggle in the early years of its existence as a factor to consider. 103 Wis. 2d at 472.

Dr. Weber testified that it cost approximately $150,000 plus time and effort to build his practice. Although Dr. Tillman testified that the noncompetition covenant was to recoup Dr. Weber's investment in recruiting Dr. Tillman and setting him up in practice, Dr. Weber indicated that the covenant was designed to protect his investment of years, education, and effort in establishing his practice and the value of goodwill developed over 17 years. These are recognized protected interests. Moreover, Dr. Tillman had no connection to the community prior to his employment, and he brought with him no patients; rather, he took patients with him when he left Dr. Weber's employment and started his own practice. Dr. Weber's office manager testified that since Dr. Tillman's departure, Dr. Weber has had some unfilled appointment slots. Dr. Tillman testified that 40% to 50% of his current patients were formerly patients of Dr. Weber's. Dr. Tillman acknowledged that he benefitted by beginning his career in an established practice rather than starting on his own.

Are the time and territory restrictions no greater than necessary for the protection of Dr. Weber's legitimate business interests? Dr. Weber's practice served patients from northwest and north-central Kansas. The nearest other dermatologists were located in Salina and Hutchinson, some distance away. The territory restriction of a 30-mile radius from Dr. Weber's offices is reasonable because that

is the territory from which Dr. Weber drew the majority of his patients. Further, the 2-year restriction is a reasonable period of time to obliterate in the minds of the public the identification of Dr. Tillman with Dr. Weber's practice and for Dr. Weber to reestablish his relationship with patients referred to Dr. Tillman. See *Fields Foundation*, 103 Wis. 2d at 479. There is ample evidence in the record that Dr. Weber desired to protect legitimate business interests and did not merely seek to prevent ordinary competition by the inclusion of a noncompetition covenant in Dr. Tillman's employment contract.

## Injury to Public Welfare

The final factor in evaluating the reasonableness of a noncompetition covenant is whether enforcement of the covenant is injurious to the public interest or welfare. Dr. Tillman argues that enforcing the noncompetition covenant would place the medical needs of northwest Kansas at risk. He points to the testimony of Beth Bowerman that Hays needs three dermatologists by the most conservative model of analysis. She also testified that the dermatology needs of the community would be in jeopardy if Dr. Tillman were not permitted to practice dermatology in Hays. Dr. Tillman points out that Dr. Weber admitted that Hays could support two or more dermatologists. Dr. Tillman concludes that Dr. Weber will have a monopoly if the covenant is enforced and Dr. Tillman is enjoined from practicing dermatology within the restricted area.

The trial court found that the testimony of Beth Bowerman concerning the difficulty in recruiting physicians to rural areas was irrelevant. Dr. Tillman asks us to consider her testimony not just for the general difficulty in recruiting physicians but also because it shows that Hays will have a shortage of dermatologists if he is enjoined from practicing there. Testimony by Bowerman, as well as by Dr. Tillman and even Dr. Weber, was that Hays can support two or more dermatologists. Bowerman's testimony in this regard is relevant to the question of whether enforcement of the noncompetition covenant here would be injurious to the public welfare. The trial court should have considered her testimony.

To support his argument, Dr. Tillman cites various cases from other jurisdictions which have held noncompetition covenants unenforceable as against public policy for various reasons. Dr. Weber distinguishes these cases and cites others supporting his position that public policy does not warrant ignoring this noncompetition covenant. Dr. Weber also points out that Dr. Tillman could set up a practice outside the restricted area and still serve the dermatology needs of the people of northwest Kansas.

Some cases discuss the public's right to a choice of physicians. Other courts have focused on the shortage of physicians in general or in the employee's particular specialty in the community.

In *Duffner*, 19 Ark. App. at 141, the court noted that the restrictive covenant unduly interfered with the public right of the availability of the orthopedic surgeon it prefers to use. The employee had not attempted to entice former patients to become patients of his new practice and had only requested the files of 28 patients, all of which were receiving only follow-up medical treatment. See *Iredell Digestive Disease Clinic*, 92 N.C. App. at 31.

In *Dick*, 107 Idaho 931, the trial court refused to enforce a noncompetition covenant against two employees, pediatricians who specialized in neonatal care. There was testimony that without the two pediatricians, there was not a sufficient number of pediatricians to provide the necessary care in that area. Further, the two pediatricians had played a significant role in developing a neonatal intensive care unit at the hospital. 107 Idaho at 934. The appellate court found that enjoining the pediatricians would have a very drastic impact in terms of providing care. It concluded that the welfare of the public in that community would be seriously impaired by enjoining the physicians from practicing their specialty and outweighed the public interest in enforcing the covenant. It denied the injunction. 107 Idaho at 935.

The Nevada Supreme Court considered a noncompetition covenant between a physician who specialized in orthopedic surgery and his employer, a clinic, which prohibited the physician's practice of medicine within 5 miles of the city for 2 years. *Ellis*, 95 Nev. 455. The appellate court noted that the public has an interest in competition but also an interest in protecting the freedom to con-

tract. The court stated that the medical profession is not exempt from enforcement of a noncompetition covenant where the covenant is reasonable. 95 Nev. at 458. The court held, however, that a restraint on the doctor's practice of his specialty of orthopedic surgery was beyond the scope of the employer-clinic's legitimate protected interest because none of the doctors at the clinic were orthopedic specialists and that patients in need of orthopedic services would be forced to travel great distances at considerable risk and expense if the orthopedic specialist were enjoined from practicing in that community. The covenant was enforced to the extent it prohibited the physician from engaging in the general practice of medicine. 95 Nev. at 459-60.

In *Damsey*, 339 So. 2d at 283, the court recognized that there was a compelling need for the employee's services as a surgeon in the community and that enforcing the covenant would jeopardize the public health of the community; thus, the noncompetition covenant would not be enforced by injunction.

*Odess*, 282 Ala. 389, involved an employee who was an otolaryngology (ENT) specialist. Pointing out that it was common knowledge that there was an acute shortage of physicians and surgeons in Alabama, particularly specialists, and that the public in Jefferson County would suffer by the removal of a highly trained specialist from practicing his profession, the appellate court found that the trial court was justified in refusing to enjoin the employee from his practice. 282 Ala. at 394. The *Odess* court also found that the noncompetition covenant was violative of an Alabama statute prohibiting contracts that restrain the practice of a profession.

Conversely, enforcing a noncompetition covenant in *Phoenix Orthopaedic Surgeons*, 164 Ariz. 54, would not leave the community with a shortage of physicians in the employee's specialty. There, a noncompetition covenant which prevented the employee from practicing orthopedic medicine and surgery for 3 years within a 5-mile radius of the employer's offices was enforced.

At least one court has found a noncompetition covenant to be injurious to the public without specifying the availability of other physicians or specialists. In *Hoddeson*, 751 S.W.2d 289, a noncompetition covenant prevented the employee from competing with

the employer and from practicing medicine for 5 years in Montgomery County, Texas. The appellate court found that enjoining the employee from practicing medicine would be injurious to the public and that the noncompetition covenant sought solely to protect the employer from competition, so the appellate court dissolved the temporary injunction granted by the trial court. 751 S.W. 2d at 290-91.

Still other courts have focused on the shortage of physicians in other communities rather than the need for physicians in the community from which the employee will be enjoined. In *Field Surgical Assoc., Ltd.*, 59 Ill. App. 3d at 995-96, the court noted that the employee could be equally useful to the public interest by practicing medicine in a location other than the restricted territory because the health of individuals living elsewhere is just as important. In *Canfield*, 44 Ill. 2d at 52, the court opined that if there is a severe shortage of physicians in any particular place, "young doctors will tend to move there, thus alleviating the shortage." In *Lareau*, 355 S.W.2d at 680, the court noted a general nationwide demand for doctors. The court further stated that although that particular community was in need of physicians, enforcement of the noncompetition covenant would not deprive the community of any service it had before the covenant was made. 355 S.W.2d at 681; but see *Dick v. Geist*, 107 Idaho 931, 935, 693 P.2d 1133 (App. 1985) (consider only the needs of this community, not some hypothetical community where the physician might serve).

In a case factually similar to this case, the North Carolina appellate courts affirmed the trial court's refusal to issue a preliminary injunction concerning a noncompetition covenant. *Iredell Digestive Disease Clinic v. Petrozza*, 92 N.C. App. 21, 373 S.E.2d 449 (1988), *aff'd* 324 N.C. 327, 377 S.E.2d 750 (1989). The covenant would restrain Dr. Petrozza from practicing in the general practice of internal medicine or gastroenterology for 3 years within a 20-mile radius of Statesville or within a 5-mile radius of any other hospital or office serviced by the clinic employer. The covenant further provided that if Dr. Petrozza violated the covenant, he would pay $50,000 for the breach, plus 15% of his gross income for 3 years. 92 N.C. App. at 23. The trial court had found that the

clinic employer, with its lone remaining physician, could not maintain the established level of medical services in gastroenterology to which the public had become accustomed and entitled; that the health and welfare of the community would be harmed if only one gastroenterologist (the one remaining at the clinic) was available; and that there would be an undue burden on the delivery of all medical services in the community and on other medical professionals who might be called upon to provide the services normally provided by gastroenterologists. 92 N.C. App. at 25.

Although finding that the time and territory restrictions were reasonable, the North Carolina Court of Appeals found that the contract was not enforceable as to Dr. Petrozza's practice of gastroenterology. The court noted that having only one gastroenterologist available would not meet the community's demand for those services, that restraining Dr. Petrozza would create an excessive workload on the remaining gastroenterologist and could create critical delays in services, and that the public would be forced to travel 40 miles if the remaining gastroenterologist were unavailable or the pubic preferred to see a different one. 92 N.C. App. at 28. The court found that the public health and welfare of the community would be harmed by the loss of Dr. Petrozza's services. The *Iredell* court noted and distinguished our decision in *Foltz v. Struxness*, 168 Kan. 714, 215 P.2d 133 (1950), because in *Foltz* there were several other doctors practicing the specialty in the community. 92 N.C. App. at 30. The court held that under the facts, the public's interest in adequate health care outweighed the parties' freedom of contract. The court also noted that enforcing the covenant would create a monopoly, which would affect fees and the availability of a doctor at all times for emergencies. Because "[t]he doctor-patient relationship is a personal one," the court was "extremely hesitant to deny the patient-consumer any choice whatsoever." 92 N.C. App. at 31.

These cases indicate generally that where a shortage of physicians in the community would be created by enforcing a noncompetition covenant, the covenant may not be enforced because it is contrary to the public interest. However, these cases concerned with a shortage of physicians involved specialties which were, for

lack of a better term, medically necessary. See *Iredell*, 92 N.C. App. 21 (gastroenterology); *Dick*, 107 Idaho 931 (neonatal); *Ellis v. McDaniel*, 95 Nev. 455, 596 P.2d 222 (1979) (orthopedic surgery); *Damsey*, 339 So. 2d 282 (surgeon); *Odess*, 282 Ala. 389 (ENT).

Dr. Tillman notes that in *Foltz*, 168 Kan. at 722, the court recognized in enforcing a noncompetition covenant that one of the considerations was that there were ample doctors and surgeons in the community. Thus, Dr. Tillman reasons, it would be contrary to public policy to allow a shortage of doctors by enforcing a noncompetition covenant. Dr. Tillman asserts that enjoining him from practicing dermatology permits Dr. Weber to monopolize dermatology services, contrary to the public's right to a choice of physician and competitive fees. This argument is unconvincing because Dr. Weber is not attempting to prevent other dermatologists from competing with him; he is seeking only to prevent Dr. Tillman from competing with him within a specific geographical area for a limited time, which Dr. Tillman agreed to in his employment contract.

The applicable test is not whether there is any restraint but whether the restraint is reasonable under the facts and circumstances of the particular case. Where the territory designated in a contract, such as that designated in this contract, is found to be more extensive than necessary to provide reasonable protection against professional encroachment, courts of equity have the power to reduce such territory to the extent reasonably necessary to insure the contemplated protection and enforce the contract to that extent and deny enforcement as to the remainder of the territory. It is the duty of courts to sustain the legality of contracts in whole or in part when fairly entered into, if reasonably possible to do so, rather than to seek loopholes and technical legal grounds for defeating their intended purpose. Although restrictive provisions in contracts of employment must be reasonable and not such as to contravene the public welfare, the paramount public policy is that freedom to contract is not to be interfered with lightly. *Foltz*, 168 Kan. 714, Syl. ¶¶ 1, 3, 5, 6.

An agreement fairly entered into, whereby a dermatologist with an established practice employs a dermatologist without a practice on a salary basis with the understanding that, upon termination of

the employment, the former employee will not engage in the practice of dermatology within a radius of 30 miles from any office or place of business of the practice at the time employment ends for a period of 2 years from the date of termination, is not invalid on its face. This court must weigh the potential injury to the public welfare by a shortage of dermatologists in Hays against the freedom to contract.

Dr. Tillman voluntarily and knowingly signed the employment contract. He knew the contract included a noncompetition clause as to practicing dermatology which would be effective upon the termination of his employment with Dr. Weber. Prior to joining Dr. Weber's practice, Dr. Tillman had no experience beyond his education (including the preceptorship) in the field of dermatology, nor did he have any connection with the Hays community. Dr. Weber enabled Dr. Tillman to begin practicing dermatology with an immediate patient load, and he introduced Dr. Tillman to the Hays community.

Under the facts, we find that there is no substantial public injury which occurs if Dr. Tillman is enjoined from practicing dermatology in Hays. The noncompetition covenant is limited to the practice of dermatology and allows Dr. Tillman to practice dermatology in the restricted area upon payment of an amount equal to 6 months' salary and bonus. Dr. Tillman posted a supersedeas bond of $90,000. Thus, as a practical matter, the people of Hays and the surrounding area may not lose Dr. Tillman's services as a dermatologist. Further, their welfare is not injured if they have to travel further to obtain dermatology services should Dr. Tillman elect not to pay liquidated damages and continue practicing in Hays. We are required to enforce the noncompetition covenant and affirm the trial court's grant of an injunction.

## AMBIGUOUS CONTRACT

Dr. Tillman also argues that the trial court erred in determining the amount of liquidated damages. The noncompetition covenant called for damages in an "amount equal to six months salary and bonus." The trial court found that the agreement was silent as to which 6 months and found that a reasonable construction was that

the contract intended the last 6 months of employment be used to calculate the amount due.

Whether an instrument is ambiguous is a matter of law to be decided by the court. As a general rule, if the language of a written instrument is clear and can be carried out as written, there is no room for rules of construction. To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more meanings is the proper meaning. *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, Syl. ¶ 2, 829 P.2d 884 (1992). Regardless of the construction of a written contract made by the trial court, on appeal a contract may be construed and its legal effect determined by the appellate court. *Mark Twain Kansas City Bank v. Cates*, 248 Kan. 700, 704, 810 P.2d 1154 (1991).

Contracts are to receive a reasonable construction to determine the intent of the parties at the time the contract was executed. The language of the contract is to receive a fair, reasonable, and practical construction. Construction of the contract is one that makes the contract fair, customary, and such as prudent persons would intend.

The contract here is uncertain as to which 6 months are to be used to determine liquidated damages. If the first 6 months of employment are used, a smaller amount of damages is due the employer. If the last 6 months of employment are used, the employee is required to pay a larger amount.

Although Dr. Weber did not himself draft the employment contract, it was prepared by his agent and, as the party with the greater bargaining power, if an ambiguity exists in the written instrument, the ambiguity should be construed against Dr. Weber. See *Shelter Mut. Ins. Co. v. Williams*, 248 Kan. 17, 23, 804 P.2d 1374 (1991). The trial court construed the liquidated damages provision to mean the last 6 months of employment, a construction most favorable to Dr. Weber. The question is whether that construction was reasonable, fair, and practical.

The parties agree that the amount of the bonus was the average of all bonuses Dr. Tillman received during the term of his employment. It is also fair, customary, and prudent that the parties would contract that the liquidated damages would be determined by using the salary the employee was receiving at termination. The trial judge's interpretation of the method of determining the amount of liquidated damages is correct.

## CALCULATING LIQUIDATED DAMAGES

For his breach of the noncompetition covenant, Dr. Tillman must pay liquidated damages of his salary for the last 6 months of employment and the average of his bonuses.

The appellate courts are not to reweigh the testimony or pass on the credibility of witnesses. *McKissick v. Frye*, 255 Kan. 566, Syl. ¶ 8, 876 P.2d 1371 (1994); *Manhattan Mall Co. v. Shult*, 254 Kan. 253, 257, 864 P.2d 1136 (1993); *Taylor v. State*, 252 Kan. 98, 104, 843 P.2d 682 (1992). In reviewing the decision of a trial court, this court must accept as true the evidence and all inferences to be drawn therefrom to support the findings of the trial court, and must disregard any conflicting evidence or other inferences that might be drawn therefrom. *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377-78, 855 P.2d 929 (1993); see *State v. Rowell*, 256 Kan. 200, 213, 883 P.2d 1184 (1994); *State v. Ratley*, 253 Kan. 394, 398, 855 P.2d 943 (1993); *State v. McKeown*, 249 Kan. 506, 515, 819 P.2d 644 (1991).

Dr. Tillman's salary for the last 6 months of employment was $72,000. Thus, the liquidated damages are $72,000 plus the bonus. The trial court accepted Dr. Weber's accountant's calculations as to the bonus, which included the disputed $10,000 from the first 6 months. The liquidated damages are $82,242.29.

Affirmed.